**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| CARRIE HUFF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-CV-625-PJC |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Claimant, Carrie Huff ("Huff"), pursuant to 42 U.S.C. § 405(g), requests judicial review

of the decision of the Commissioner of the Social Security Administration ("Commissioner")

denying her applications for disability insurance benefits and supplemental security income

benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*.  In accordance with 28 U.S.C. §

636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge.

Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.  Huff appeals the

decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred

because the ALJ incorrectly determined that Huff was not disabled.  For the reasons discussed

below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

Huff was 37 years old at the time of the hearing before the ALJ on December 2, 2010.

(R. 30).  At the hearing, Huff amended her asserted date of onset of disability to July 29, 2009,

which was when she had last worked.  (R. 28).  She graduated high school.  (R. 31).  She last

worked as a waitress at a restaurant.  *Id.*

Huff testified that she quit working as a waitress because she couldn't handle the stress and the people any more. *Id.* She hadn't attempted to get other work, because she believed that more education would be required, and she did not believe she could go back to school. (R. 31-32). She said that she was in bed most of the time. (R. 32).

When listing the reasons why she could not work, Huff testified that her medications made her dizzy and drowsy. (R. 33). She said that she had racing thoughts and trouble concentrating. (R. 33, 37).She said that if she watched a television program, she would rewind it every ten or 15 minutes. (R. 37-38). She had major anxiety, depression, and panic attacks. *Id.* She felt "overwhelmed by things" all of the time. (R. 33). She testified that she had suicidal thoughts, but no plan. *Id.*

Huff testified that she had to "work up the nerve" to leave her bed to shower when her husband told her that she needed a shower. (R. 34). She said that she had difficulty with household chores. *Id.* She did the dishes because she did not like to have dirty dishes in the sink. *Id.* She did the laundry, but instead of folding the clothes, she threw them into bins. *Id.* She felt overwhelmed by the thought of folding the clothes, because there were so many of them. (R. 35). She didn't cook due to not having the necessary items or not being able to decide what to cook. *Id.*

Huff testified that meeting people scared her, and she would get nervous, exhausted, anxious, and sweaty when she had to be around people. *Id.* She only left the house when she had to, and she forced herself to go to doctor appointments. *Id.* She went to the store, but she made it a fast trip in and out. (R. 35-36). She usually listened to church on the telephone from her bed at home or from the parking lot, because she had trouble going in the building. (R. 36). She didn't want to be around people. *Id.*

2

Huff testified that she became depressed due to her inability to accomplish anything, and she preferred to stay in bed. (R. 36). Huff said that she felt worthless and that others would be better off without her. (R. 38). She felt that she would rather be dead. *Id.*

Huff testified that she was not addicted to Xanax, but it had been prescribed for her by her physician to help her with her feelings of being overwhelmed. (R. 39-40). The doctor prescribed it to be taken three or four times a day, and she usually took it three times. (R. 40). If she had a really bad day, she would take it a fourth time. *Id.* If she had to go to the doctor or go to the store, she would take the fourth one. *Id.* She said that the Xanax took "the edge off." *Id.* She said that she needed Tylenol and Benadryl along with the Xanax in order to take a shower or get to the doctor. *Id.* Even with her medications, she felt anxious. *Id.*

Huff saw Michael D. David for medication refills on March 30, 2007. (R. 220). The hand-written notes appear to state that Huff's doctor was out of town, and Huff needed the medications that day because her insurance was expiring. *Id.* The notes refer to bipolar disorder and seasonal affective disorder. *Id.* At another appointment on July 31, 2007, Huff said that she was doing well on Prozac and Xanax. (R. 218). The hand-written notes say that Huff was to be seen in 8 days at the Grand Lake Mental Health Center (the "GLMHC") and that she needed to be on an anti-psychotic medication such as Geodon. *Id.*

Huff was seen at the GLMHC on August 8, 2007. (R. 347). She said that she was seeking services due to bipolar disorder, anxiety, and stress. *Id.* She reported daily anxiety, irritability, and angry outbursts. *Id.* She began individual and group counseling and attended through September 2008. (R. 259-346).

Huff was seen by Debbe Hendrix, ARNP-C on October 1, 2007 for anxiety, bipolar disorder, and insomnia. (R. 482). She was prescribed Buspar, Effexor, and Clonazepam[1]. *Id.* At a follow-up appointment on October 15, 2007, Huff's medications were changed to Paxil, Buspar, and Amitriptyline. (R. 481). At a follow-up appointment on October 27, 2007, Huff was prescribed Cymbalta. (R. 480).

Huff was seen on November 7, 2007 by Shirley Chesnut, D.O. at GLMHC. (R. 232). Huff's current medications were Cymbalta, Buspar, Clonazepam, and Amitriptyline. *Id.* Huff specifically requested Xanax, stating that it had been helpful to her in the past. *Id.* Dr. Chesnut adjusted Huff's medications to Cymbalta, Buspar, Depakote, Trazodone, and Atarax. *Id.*

Huff was seen by Hendrix on December 1, 2007, and she reported that she was having a crisis but could not afford to go to the emergency room. (R. 477). She reported that she would be going to GLMHC the next week. *Id.* Hendrix prescribed Clonazepam. *Id.*

At a follow-up appointment with Dr. Chesnut at GLMHC on December 5, 2007, Huff's husband said that medications had made Huff's anxiety worse. (R. 231). Dr. Chesnut agreed to taper Huff off of her medications and for her to use Clonazepam "on a very limited basis." *Id.* On December 12, 2007, Huff was off of her medications, and Dr. Chesnut observed her to be somewhat less anxious and easier to interview. (R. 230). Huff continued to complain of anxiety. *Id.*

At an appointment at GLMHC on January 9, 2008, Huff continued to request benzodiazepine medications for extreme anxiety, but Dr. Chesnut did not find that Huff's blood pressure and pulse rate reflected that level of anxiety. (R. 229). Dr. Chesnut said that "[m]ed

---

[1] Clonazepam is also known by the brand name Klonopin. www.pdr.net. For consistency, the Court refers to this medication as Clonazepam even if the provider refers to it as Klonopin.

seeking has been a problem with this patient in the past and continues." *Id.* She added

Trazodone to Huff's Clonidine. *Id.* On February 8, 2008, Huff said that she had discontinued all

medications because they didn't work, and she continued to have anxiety and insomnia. (R.

228). Dr. Chesnut prescribed Rozerem. *Id.*

Also, on February 8, 2008, Huff presented to Hendrix. (R. 476). The hand-written notes

are difficult to decipher, but it appears that Huff may have said that Dr. Chesnut was not giving

her appropriate medications. *Id.* Huff said that she had insomnia and needed something to help

her sleep, and Hendrix prescribed Amitriptyline. *Id.* At a follow-up appointment on February

21, 2008, Huff told Hendrix that she was not taking any prescription medications. (R. 475).

Hendrix prescribed Seroquel, and it appears that she may have refilled Elavil. *Id.*

Huff presented to the emergency room at Integris Grove General Hospital on March 7,

2008 with an anxiety attack. (R. 428-33). She was given injections of Vistaril and Ativan. (R.

431). It appears that she was given prescriptions for Clonazepam and Prozac. (R. 433).

At an appointment with Hendrix on March 21, 2008, it appears that Huff said that she

was not taking any prescription medications. (R. 474). It appears that Hendrix wrote that Huff

"would benefit from return to work & constructive routine." *Id.* Huff saw Hendrix on July 15,

2008 for an allergy shot. (R. 473). It appears that Hendrix wrote that Huff was only taking

Elavil as needed, but was otherwise doing well. *Id.*

The record reflects that a letter was sent on January 15, 2009 instructing Huff to return if

she needed services. (R. 258). The form indicates discharge diagnoses on Axis I[2] of major

---

[2] The multiaxial system "facilitates comprehensive and systematic evaluation." American
Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text
Revision 4th ed. 2000) (hereinafter "DSM IV").

depressive disorder, recurrent, moderate, and on Axis II of borderline personality disorder. *Id.*

Her discharge Global Assessment of Functioning ("GAF")[3] was scored as 45. *Id.*

A discharge summary from St. John's Regional Medical Center in Joplin, Missouri

indicates that Huff was hospitalized from May 26, 2009 to June 4, 2009. (R. 223-24). Her

hospitalization was due to "severe symptoms of mood lability and anxiety." (R. 223). Axis I

diagnoses were bipolar disorder, not otherwise specified, and anxiety disorder, not otherwise

specified. *Id.* On Axis II, Huff was diagnosed with personality disorder not otherwise specified.

*Id.* Huff's GAF on admission was scored as 30, and on discharge as 45. *Id.* Her medications on

discharge included Geodon, Singulair, Lamictal, Motrin, and Xanax. *Id.*

Huff saw Dr. David on June 19, 2009, and he prescribed Geodon and Xanax. (R. 414).

Huff saw Dr. David on July 15, 2009, stating that her depression was not improving and that she

was staying in bed. (R. 415). Dr. David assessed mood disorder not otherwise specified and

depression. *Id.* He prescribed Geodon, Xanax, and Lamictal. *Id.* Huff saw Dr. David on

August 20, 2009 for medication refills. (R. 417). Huff had been out of her medications. *Id.* Dr.

David assessed bipolar affective disorder, depressed, and mood disorder not otherwise specified.

*Id.* He again prescribed Geodon, Xanax, and Lamictal. *Id.*

---

[3] The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id.*

Huff was again hospitalized at St. John Regional Medical Center in Joplin, Missouri from September 8, 2009 to September 18, 2009.  (R. 391-409).  The discharge summary lists her final diagnoses on Axis I as bipolar disorder by history, and Axis II as borderline personality disorder by history.  (R. 392).  Her discharge medications were Singular, Abilify, Lamictal, and Xanax. *Id.*

Huff saw Dr. David for follow up on September 23, 2009.  (R. 412).  His assessments were bipolar affective disorder, depressed, and psychosis.  *Id.*  He prescribed Lamictal, Xanax, and Abilify.  *Id.*

Huff saw Hendrix on October 14, 2009, seeking refills even though she had not been seen by Hendrix for 15 months.  (R. 472).  Hendrix prescribed Abilify.  *Id.*  Hendrix wrote that Huff needed "to return to work & establish routine!"  *Id.*

Huff saw Dr. David for follow up of her depression and anxiety symptoms and received prescriptions on October 28, 2009, November 30, 2009, December 28, 2009, and January 25, 2010.  (R. 410, 436-41).

It appears that Huff attended counseling at GLMHC from September 2009 to April 2010. (R. 454-71).

On April 20, 2010, Huff arrived at GLMHC for counseling.  (R. 514).  Huff told the counselor that she had already taken a Xanax before arriving at her appointment, and she took another Xanax at the appointment.  *Id.*  The counselor wrote that "[i]t appears that [Huff] is overdosing on Xanax at this time and states she is prescribed to take this 4 times per day."  *Id.* She was assessed as needing in-patient stabilization.  *Id.*  She was transferred  by police car to the emergency room of Integris Grove General Hospital on April 20, 2010, due to suicidal ideation. (R. 489-504).

Huff attended counseling at GLMHC in May 2010.  (R. 511).

Huff saw Weldon Mallgren, D.O. at GLMHC on May 14, 2010 for pharmacological management.  (R. 509-10).  He reported that Huff's mood was dysthymic, her affect was anxious, and her thought process was tangential.  (R. 510).  His Axis I diagnosis was bipolar disorder (296.7), and his Axis II diagnosis was borderline personality disorder (301.83).  *Id.*  He prescribed Trileptal, Lamictal, and dramamine.  *Id.*  He noted that Huff received Xanax from her primary care provider.  *Id.*

At a counseling appointment at GLMHC in June 2010, it was noted that Huff could not be seen for additional counseling due to funding cuts.  (R. 507).

Huff saw Dr. Mallgren on August 2, 2010, and Huff complained that she had experienced a difficulty in getting her Xanax refilled.  (R. 505-06).  Dr. Mallgren noted that Huff's  mood was frustrated, her affect was anxious, and her thought process was tangential.  (R. 506).  He continued his diagnoses and medications.  *Id.*

A Medical Source Opinion of Ability to do Work-Related Activities (Mental) form was completed by Joseph Telker dated November 20, 2009.  (R. 525-27).  His credentials with his signature are not completely clear but appear to include LPC "under supervision."  (R. 526).  On 6 of the 13 activities listed on the form, Telker wrote that he was "unable to assess."  (R. 525-26).  He assessed a marked limitation on Huff's ability to maintain attention and concentration for extended periods in order to perform simple tasks or detailed tasks.  (R. 525).  He assessed a moderate limitation of Huff's ability to adhere to a schedule and maintain regular attendance.  *Id.* He assigned a slight limitation of her ability to understand and remember detailed instructions and her ability to interact with the public.  (R. 525-26).  He assessed no limitation in her ability to understand and remember simple instructions and in her ability to maintain socially appropriate

behavior and basic standards of neatness and cleanliness. *Id.* He said that Huff was not able to

manage benefits in her own best interest. (R. 526). He said that his therapeutic relationship with

Huff was three times a month from September 8, 2009 to the date of the form. (R. 527).

Luther Woodcock, M.D., a nonexamining agency medical consultant, completed a

Physical Residual Functional Capacity Assessment on September 15, 2009. (R. 383-90). Dr.

Woodcock determined that Huff had the exertional capacity to perform medium work. (R. 384).

For narrative explanation, Dr. Woodcock wrote that Huff alleged mental impairments only. *Id.*

He noted that she had injured her knee on April 3, 2009, but that the injury would be expected to

heal within 12 months. *Id.* Dr. Woodcock found no other limitations. (R. 385-90).

Nonexamining agency consultant Cynthia Kampschaefer, Psy. D., completed a

Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment

form on September 10, 2009. (R. 365-82). On the Psychiatric Review Technique form, Dr.

Kampschaefer noted for Listing 12.04 that Huff had bipolar syndrome. (R. 368). For Listing

12.06, she noted Huff's anxiety. (R. 370). For Listing 12.08, Dr. Kampschaefer noted

personality disorder, not otherwise specified. (R. 372). For the "Paragraph B Criteria,"[4] Dr.

Kampschaefer found that Huff had moderate restriction of her activities of daily living, moderate

difficulties in maintaining social functioning, and mild difficulties in maintaining concentration,

persistence, or pace, with one or two episodes of decompensation. (R. 375). In the "Consultant's

---

[4] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

Notes" portion of the form, Dr. Kampschaefer noted Huff's claims of bipolar disorder, anxiety, panic attacks, and major depression. (R. 377). She noted that there was medical evidence of record showing a history of anxiety, bipolar disorder, and personality disorder. *Id.* Dr. Kampschaefer noted Huff's psychiatric hospitalization from May 26, 2009 to June 4, 2009. *Id.* Dr. Kampschaefer noted other reports in the administrative file, and she summarized Huff's activities of daily living. *Id.*

On the Mental Residual Functional Capacity Assessment form, Dr. Kampschaefer found moderate limitations in Huff's ability to understand, remember, and carry out detailed instructions. (R. 379). She noted a moderate limitation in Huff's ability to interact appropriately with the general public. (R. 380). Dr. Kampschaefer found no other significant limitations. (R. 379-80). In narrative comments, Dr. Kampschaefer said that Huff could perform simple and some complex tasks. (R. 381). She said that Huff could relate to others on a superficial work basis and could adapt to a work situation. *Id.*

### Procedural History

In July 2009, Huff filed applications for Title II disability insurance benefits and for Title XVI supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (R. 112-21). The applications were denied initially and on reconsideration. (R. 54-61, 67-72). A hearing before ALJ Richard J. Kallsnick was held on December 2, 2010. (R. 25-48). By decision dated December 17, 2010, the ALJ found that Huff was not disabled. (R. 12-19). On August 12, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-6). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[5]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v.*

---

[5] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work.  20 C.F.R. § 404.1520.

*Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Huff met insured status requirements through the date of the decision. (R. 14). At Step One, the ALJ found that Huff had not engaged in substantial gainful activity since her alleged onset date of July 29, 2009. *Id.* At Step Two, the ALJ found that Huff had severe impairments of bipolar disorder, anxiety disorder, and personality disorder. *Id.* At Step Three, the ALJ found that her impairments did not meet the requirements of a Listing. (R. 15).

The ALJ found that Huff had the RFC to perform a full range of work at all exertional levels "with the following nonexertional limitations: She can perform simple and some complex tasks and can interact with others on a superficial work basis with minimal contact with the general public." (R. 15). At Step Four, the ALJ found that Huff was unable to perform any past relevant work. (R. 18). At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Huff could perform, taking into account her age, education, work experience, and RFC. *Id.* Therefore, the ALJ found that Huff had not been under a disability from July 29, 2009 through the date of the decision. (R. 19).

**Review**

Huff asserts that the ALJ erred by failing to properly consider the medical opinion of

Telker, that the ALJ's credibility assessment is flawed, and that his RFC assessment is not

supported by substantial evidence.  Regarding the issues raised by Huff, the undersigned finds

that the ALJ's decision is supported by substantial evidence and complies with legal

requirements.  Therefore, the ALJ's decision is affirmed.

**Medical Opinion Evidence**

The first issue addressed by Huff is whether the ALJ properly considered the medical

opinion given by Telker.  Huff agrees that Telker, apparently a licensed practical counselor, is not

an "acceptable medical source."  Social Security Ruling (hereafter, "SSR") 06-03p.  SSR 06-03p

addresses how to consider opinions from medical sources who are not "acceptable medical

sources."

> Information from these "other sources" cannot establish the existence of a
> medically determinable impairment.  Instead, there must be evidence from an
> "acceptable medical source" for this purpose.  However, information from such
> "other sources" may be based on special knowledge of the individual and may
> provide insight into the severity of the impairment(s) and how it affects the
> individual's ability to function.

SSR 06-03p, 2006 WL 2329939, *2.  Noting that "not every factor for weighing opinion

evidence will apply in every case," the ruling provides the following factors for the ALJ's

consideration:

> • How long the source has known and how frequently the source has seen the
> individual;
> • How consistent the opinion is with other evidence;
> • The degree to which the source presents relevant evidence to support an opinion;
> • How well the source explains the opinion;
> • Whether the source has a specialty or area of expertise related to the individual's
> impairment(s); and
> • Any other factors that tend to support or refute the opinion.

*Id.* at \*5.  The ALJ should explain the weight given to these opinions in his decision for subsequent review.  *Id.* at \*6.

Here, the ALJ noted that Telker had given an opinion of a marked limitation in maintaining attention and concentration for extended periods.  (R. 17).  He said that he had considered the evidence submitted, but that "the evidence does not corroborate [Telker's] opinion."  *Id.*  It would have been better practice for the ALJ to give a more comprehensive explanation for giving Telker's opinion little weight.  *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012) ("The more comprehensive the ALJ's explanation, the easier our task; but we cannot insist on technical perfection.").  In *Keyes-Zachary*, the Tenth Circuit rejected an argument that the ALJ had not sufficiently discussed treating physician opinion evidence:

> In sum, we reject [claimant's] contention that the ALJ's opinion does not adequately evaluate and discuss the medical-source evidence.  Where, as here, we can follow the adjudicator's reasoning in conducting our review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal.

*Id.*  The ALJ's brief explanation that Telker's opinion of a marked limitation was not corroborated by other medical evidence was sufficient.  *See Zumwalt v. Astrue*, 220 Fed. Appx. 770, 780 (10th Cir. 2007) (unpublished) (LPC was not an acceptable medical source, and ALJ's treatment of her evidence was sufficient).

**Credibility Assessment**

Credibility determinations by the trier of fact are given great deference.  *Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations].  Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2001).  In evaluating credibility, an ALJ must

give specific reasons that are closely linked to substantial evidence.  *Kepler v. Chater*, 68 F.3d

387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

The ALJ first discussed Huff's treating history in some detail, including instances when

Huff was not compliant in taking her medications.  (R. 16-17).  He concluded that the evidence

was "persuasive that when [Huff] takes her medication as prescribed, she is able to function."

(R. 17).  Failure to be compliant with medication is one factor that can support a credibility

assessment.  *Romero v. Astrue*, 242 Fed. Appx. 536, 543 (10th Cir. 2007) (unpublished).

The ALJ stressed that Huff's restricted activities of daily living were self imposed.  He

noted that Hendrix had told Huff that she would benefit from returning to work and having a

constructive routine.  The opinion of Hendrix, as an "other source," that Huff should return to

work, obviously undermines Huff's claim that she is unable to work.  *See, e.g., Briggs v. Astrue*,

221 Fed. Appx. 767, 772 (10th Cir. 2007) (unpublished) (approving ALJ's adverse credibility

assessment based in part on treating physician's release to work); *Qantu v. Barnhart*, 72 Fed.

Appx. 807, 811 (10th Cir. 2003) (unpublished) (ALJ correctly stated that claimant's complaints

conflicted with treating physicians' opinions that she could return to work).

Huff's arguments in attempting to combat the credibility assessment of the ALJ constitute

"an invitation to this court to engage in an impermissible reweighing of the evidence and to

substitute our judgment for that of the Commissioner," and the undersigned declines that

invitation.  *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005); *Miller ex rel. Thompson*

*v. Barnhart*, 205 Fed. Appx. 677, 681 (10th Cir. 2006) (unpublished) (claimant disputed ALJ's

view of evidence and relied on other evidence, but court declined to reweigh evidence).  First,

Huff argues that the ALJ was wrong concerning his conclusion that Huff was able to function

when she took her medication.  Plaintiff's Opening Brief, Dkt. #15, pp. 6-7.  The undersigned

agrees with Huff that the evidence is mixed, but an underlying point of the ALJ was that failure

to comply in taking prescription medication undermined Huff's credibility.  As discussed above,

Huff's failure to comply with her doctor's recommendations and with their prescribed

medications was a legitimate reason to find Huff less than fully credible.  The mixed evidence on

how effective her medications were does not affect this point regarding Huff's credibility.

Huff next complains that the ALJ included some boilerplate language in his credibility

assessment.  The undersigned disagrees with this characterization.  However, even if some of the

language constitutes boilerplate, it does not affect the remainder of his assessment, which is

"closely and affirmatively linked to substantial evidence."  *Miller v. Astrue*, 2012 WL 4076128

*4 (10th Cir.) (unpublished) (affirming credibility assessment "despite the use of disfavored

language").

Huff complains that Hendrix's statements that Huff needed to return to work and a

constructive routine "came from a nurse practitioner who had not seen [Huff] for over a year,"

citing to page 472 of the administrative transcript.  The difficulty with Huff's argument is that

Hendrix made a similar statement on March 21, 2008.  (R. 474).  At that time, Hendrix had seen

Huff six times since October 1, 2007.  (R. 475-77, 480-82).  The ALJ was entitled to take into

account that at least one of Huff's treating professionals, albeit an "other source," believed that

Huff needed to return to a work environment that would allow her to have a constructive routine.

This was substantial evidence that supported the ALJ's adverse credibility assessment.

At this point in her arguments, Huff makes several one-sentence assertions.  These

arguments are perfunctory and deprive the Court of the ability to meaningfully analyze them.

They are therefore waived.  *Wall v. Astrue*, 561 F.3d 1048, 1066 (10th Cir. 2009).  Even without

a finding of waiver, these truncated arguments are not persuasive.  For example, Huff mentions

that Telker thought that Huff was more limited than the ALJ found.  This argument does not

affect the ALJ's credibility assessment.  Huff's argument that there was "no evidence" that the

restriction of her daily activities was "self imposed" is simply wrong.  To the contrary, Huff's

own testimony was that she stayed in bed of her own volition , saying "I'd just rather be in bed."

(R. 32-36).  While Huff's testimony was that her preference for staying in bed was due to her

depression and psychological conditions, this does not affect the ALJ's point, that none of Huff's

medical providers had told her to limit her activities.

Huff then complains that the ALJ failed to consider her extensive treatment.  She says

that the ALJ did not acknowledge most of the records from GLMHC, including GAF scores.  The

ALJ cited extensively to Exhibits 3F and 15F in his summary of Huff's treating history, and

those records are from GLMHC.  (R. 16-17).  While Huff says that the ALJ "ignored" her

hospitalizations, he mentioned her September 2009 hospitalization (R. 16), and mentioned the

episode that triggered her April 2010 hospitalization (R. 17).  While Huff says that the ALJ

ignored GAF scores that indicated serious problems, she does not cite to specific pages in the

record to support this statement. *Gilbert v. Astrue*, 231 Fed. Appx. 778, 782 (10th Cir. 2007)

(unpublished) ("In the absence of essential references to the record in a party's brief, the court

will not 'sift through' the record to find support for the claimant's arguments.") (further

quotation and citation omitted).

Finally, Huff argues that she has been consistent in asserting that she has difficulties

staying on task and completing tasks and that this is also consistent with her medical treatment

records.  The ALJ gave some credence to Huff's allegations in this regard, because he limited her

to "simple and some complex tasks."  Huff's consistency in this regard does not undermine the

ALJ's adverse credibility assessment.

The undersigned finds that the ALJ's credibility assessment was "closely and affirmatively linked to substantial evidence" that supported the conclusion that Huff was not fully credible.  *Hackett*, 395 F.3d at 1173.

**RFC Determination**

Huff's last point is that she did not have the RFC to perform work on the sustained basis that is required by a competitive environment.  She points to Telker's assessment that she had moderate or marked limitations in her ability to maintain attention and concentration for extended periods and in her ability to adhere to a schedule and maintain regular attendance.  She also points to the medical evidence that she had racing thoughts, mood swings, and confused thoughts.

This argument is not a strong one, and the undersigned has already explained that the ALJ's treatment of Telker's opinion evidence was adequate.  The ALJ acknowledged Huff's testimony regarding her inability to handle stress.  (R. 16).  He acknowledged that she said that she had racing thoughts, panic attacks, and suicidal thoughts all the time.  *Id.*  He reviewed the medical evidence and concluded that Huff's medications were effective when she took them as prescribed.  (R. 17).  He also relied on the report of Dr. Kampschaefer, whose opinion was that Huff could perform simple and some complex tasks and that she could adapt to a work situation. (R. 17, 381).  The report of Dr. Kampschaefer was substantial evidence that supported the RFC determination of the ALJ.  *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (nonexamining consultant's opinion was an acceptable medical source which the ALJ was entitled to consider and which supported his RFC determination); *Franklin v. Astrue*, 450 Fed. Appx. 782, 790 (10th Cir. 2011) (unpublished) (RFC assessment of nonexamining consultant

was part of substantial evidence that supported the ALJ's findings); *Weaver v. Astrue*, 353 Fed.

Appx. 151, 154-55 (10th Cir. 2009) (unpublished).

The ALJ's RFC determination was supported by substantial evidence and was in

compliance with legal requirements.

### Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct

legal standards were applied.  The decision is **AFFIRMED**.

Dated this 23rd day of January 2013.

Paul J. Cleary
United States Magistrate Judge

19